Erin Rose Ronstadt, SBN 028362
Clayton Warren Richards, SBN 029054
OBER PEKAS RONSTADT, PLLC
3030 N. 3rd Street, Suite 1230
Phoenix AZ 85012
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oprdisabilitylaw.com
clayton@oprdisabilitylaw.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tonya D. King, | No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Airgas, Inc. Comprehensive Welfare Benefits Plan, an ERISA benefit plan; and The Hartford Life and Accident Insurance Company, a plan fiduciary; | |
| Defendants. | |

For her claims against the Airgas, Inc. Comprehensive Welfare Benefits Plan (the "Plan"), an ERISA benefit plan and The Hartford Life and Accident Insurance Company ("The Hartford"), a plan fiduciary (collectively "Defendants"), Plaintiff Tonya D. King ("Ms. King" or "Plaintiff") alleges as follows:

### *Jurisdiction, Venue, and Parties*

1.      This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2.      Ms. King brings this action under ERISA, pursuant to 29 U.S.C. §§ 1132(a)(1)(b) and (a)(3), to recover long-term disability ("LTD") benefits under the terms of the Plan; to enforce her rights under the terms of the Plan; to clarify her rights to future benefits under the terms of the Plan; and to obtain appropriate equitable relief to redress Defendants' violations of ERISA and the terms of the Plan.

3.      The Plan is a purported ERISA benefit plan established and maintained by Airgas for the benefit of its employees.

4.      Ms. King was a participant and beneficiary of the Plan as an employee of Airgas.

5.      Under the Plan, The Hartford insured LTD benefits under the policy GLT-675809.

6.      The Hartford is the LTD insurer and third-party claims administrator for the Plan.

7.      The Hartford is a Plan fiduciary.

8.      The Hartford has a duty to administer the Plan prudently and in the best interests of all Plan participants and beneficiaries, including Ms. King.

9.      At the time Ms. King sought LTD benefits under the Plan, The Hartford administered claims for Airgas under the Plan, acted on behalf of the Plan, and acted as an agent of Airgas and/or the Plan to make final decisions regarding the payment of LTD benefits for the Plan and to administer the Plan.

10.     Ms. King currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

11.     The Plan and Airgas have their principal places of business in the Commonwealth of Pennsylvania.

12.     The Hartford has its principal place of business in the State of Connecticut.

13.     Defendants are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

14.     This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

15.     Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

## GENERAL ALLEGATIONS

### *Ms. King's Disability*

16.     Ms. King suffers from several medical impairments that affect her physical functioning, including neurocardiogenic or vasovagal syncope, orthostatic hypotension, and postural orthostatic hypotension ("POTS"); a Chiari malformation; carpal tunnel syndrome; and sinus, pulmonary, and thyroid impairments.

17.     Ms. King's neurocardiogenic or vasovagal syncope, orthostatic hypotension, and POTS cause syncopal episodes.

18.     Syncopal episodes are brief losses of consciousness that occur with decreased blood flow and diminished oxygen supply to the brain.

19.     Ms. King's neurocardiogenic or vasovagal syncope, orthostatic hypotension, and POTS also cause other symptoms including lightheadedness or dizziness with position changes, blurred or tunnel vision, heart palpitations or rapid heartbeat, nausea, confusion, fatigue, and weakness.

20.     Ms. King's diagnoses are supported by diagnostic, clinical, and physical examination findings.

21.     Ms. King's Chiari malformation, a structural defect in the base of the skull and cerebellum, can also cause headaches, neck pain, poor balance, muscle weakness or numbness, and sleep difficulties.

22.     In February 2019, Ms. King underwent surgery to address symptoms of carpal tunnel syndrome.

23.     Ms. King's carpal tunnel syndrome remains symptomatic despite this procedure.

24.     Ms. King also suffers from chronic ethmoid sinusitis, chronic maxillary sinusitis, bilateral inferior turbinate hypertrophy, and bilateral nasal valve collapse.

25.     Diagnostic imaging from December 2017 revealed inflammatory changes in the paranasal sinuses, amongst other clinically significant findings.

26.     In February 2018, Ms. King had surgery to address her sinus symptoms.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

27.    Ms. King still suffers ongoing, acute exacerbations of sinusitis, asthma, and upper respiratory infections.

28.    Ms. King also suffers from an autoimmune condition known as Hashimoto's disease that causes thyroid dysfunction and can result in fatigue, muscle weakness or stiffness, weight gain, slowed heart rate, and impaired memory.

29.    Ms. King suffers from a host of other physical conditions which impact her daily functioning, including migraine headaches, joint pain, gastrointestinal and bladder problems, leg edema, sleep apnea, and insomnia.

30.    Ms. King's treating physicians repeatedly endorsed her Disability throughout the duration of her short-term disability ("STD") and LTD claims with The Hartford.

### *Plan Language*

31.    Under the Plan, "Disability" or "Disabled" is defined as the inability to perform "one or more of the Essential Duties of: (1) Your Occupation during the Elimination Period; (2) Your Occupation, for the 24 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 60% of Your Indexed Pre-Disability Earnings; and (3) after that, Any Occupation."

32.    The Elimination Period under the Policy is 180 days from the date of Disability.

33.    The Plan defines "Essential Duties" as duties that are "substantial, not incidental": "fundamental or inherent to the occupation"; and "cannot be reasonably omitted or changed."

34.    The Plan clarifies, "Your ability to work the number of hours in Your regularly scheduled workweek is an Essential Duty."

35.    The Plan defines "Your Occupation" as "Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location."

36.    The Plan defines "Any Occupation" as "any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than

-4-

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1   the lesser of: (1) the product of Your Indexed Pre-disability Earnings and the Benefit

2   Percentage; or (2) the Maximum Monthly Benefit."

3       37.    The Plan defines "You or Your" as "the person to whom this certificate is

4   issued."

5       38.    The Plan limits LTD benefits to 24 total months if the individual is Disabled

6   because of "Mental Illness that results from any cause; any condition that may result from

7   Mental Illness; alcoholism; or the non-medical use of narcotics, sedatives, stimulants,

8   hallucinogens, or any other such substance . . .."

9       39.    The Plan defines Mental Illness as "a mental disorder as listed in the current

10  version of the Diagnostic and Statistical Manual of Mental Disorders, published by the

11  American Psychiatric Association. A Mental Illness may be caused by biological factors or

12  result in physical symptoms or manifestations."

13                          ***Ms. King's Claim for LTD Benefits***

14      40.    Airgas employed Ms. King as an Accounts Receivable/Collections Supervisor

15  beginning in September 2009.

16      41.    After she underwent a cholecystectomy procedure in late 2012, Ms. King

17  began suffering from syncopal episodes with residual symptoms of fatigue, left arm and leg

18  tremors, and low blood pressure.

19      42.    Specialists at the Barrow Epilepsy Monitoring Unit initially characterized the

20  spells as non-epileptic seizures.

21      43.    Ms. King also experienced symptoms including fatigue, heart palpitations,

22  diminished concentration, paresthesias, and tingling, which are well-documented in her

23  treatment records from that time.

24      44.    She last worked on January 17, 2013 due to her several medical conditions.

25      45.    Neuropsychological testing performed a few days before her last day of work

26  also revealed a discernable cognitive impairment.

27      46.    Notably, "mental clouding" or "brain fog" are common symptoms of POTS,

28  as documented in recent medical research.

47.     As a result of her several impairments, The Hartford administered and paid Ms. King's STD benefits.

48.     In July 2013, the Hartford commenced paying Ms. King's LTD benefits.

49.     In August 2013, diagnostic testing confirmed Ms. King suffers from neurocardiogenic syncope.

50.     The Hartford engaged in early efforts to generate unfavorable evidence and limit its liability on Ms. King's LTD claim.

51.     Notably, The Hartford contracted with EMSI Investigative Services ("EMSI") to surveil Ms. King on March 10, 2014.

52.     The written report of the surveillance references 2 minutes and 19 seconds of video taken during approximately 8 hours of on-site surveillance outside of Ms. King's home.

53.     At no time did the investigators observe Ms. King leaving her home or conducting any strenuous physical activity.

54.     EMSI again conducted surveillance of Ms. King for over 19 hours on April 18th and 19th, 2014, but according to the written report, the investigators only observed Ms. King riding as a passenger in a vehicle to her doctors' appointments.

55.     The Hartford also conducted an in-person interview with Ms. King at her residence in June 2014, but this too failed to reveal any evidence Ms. King was capable of performing full-time work activity.

56.     On June 13, 2014, The Hartford concluded, "[Special Investigations Unit] has completed its investigation and has been unable to identify any evidence warranting continued investigation at this time."

57.     Nevertheless, The Hartford continued fervently investigating Ms. King's claim, including referring her claim to a case manager for a clinical assessment "to clarify whether the [restrictions and limitations] [Ms. King's treating internist physician] provided . . . are supported and if so, are they expected to be permanent as indicated."

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

58. The Hartford's nurse case manager conducted several medical file reviews from January through April 2015.

59. In April 2015, claimant's treating internist, Dr. Ron Kennett, opined Ms. King was limited to sitting for only two hours at a time for up to four hours in a day, with no standing or walking, and only minimal lifting or carrying.

60. Despite the work-preclusive opinion of Ms. King's treating physician, The Hartford scheduled Ms. King to attend an independent medical examination with a neurologist, Dr. David Marzulo, as part of its seemingly continuous review of her LTD claim.

61. In July 2015, Dr. Marzulo interviewed and examined Ms. King at The Hartford's behest.

62. The Hartford's justification for the examination was a change in the definition of Disability under the Policy.

63. Effective July 2015, the Plan required Ms. King to be Disabled from Any Occupation, rather than just her own occupation, to qualify for Disability benefits.

64. In his report, Dr. Marzulo opined Ms. King could only work a four-hour day without any frequent changes in position, such as from sitting to standing, for a maximum of 20 hours per week.

65. Dr. Marzulo documented objective evidence of Ms. King's impairments on examination, such as her increased pulse rate from a sitting to standing position, which "is consistent with [Ms. King's] symptoms of dizziness, imbalance, [and] syncope, along with associated subjective complaints of memory[ and] fatigue, among other listed symptoms which can be seen frequently in patients with POTS."

66. Dr. Marzulo noted that, given the duration of Ms. King's symptomology, "further improvement in [her] condition on a spontaneous basis is not anticipated."

67. The Hartford concluded Ms. King was Disabled from Any Occupation and continued to pay LTD benefits based on Dr. Marzulo's opinion.

68.     The Hartford paid Ms. King's LTD benefits resulting from physical Disability for three-and-a-half more years.

69.     Throughout that period of time, the Hartford's claims managers, nurse case managers, and consultants repeatedly corroborated Ms. King's physical Disability under the Plan.

70.     In July 2016, the Social Security Administration ("SSA") awarded Ms. King's application for Social Security disability ("SSD") benefits, finding she was disabled as of her last day of work in January 2013.

71.     Disability under the Social Security Act is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . [that is of] such severity that [the claimant] . . . cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives."

72.     After approving Ms. King's claim past the Any Occupation definition of Disability, the Hartford's attention turned toward monitoring Ms. King's SSD claim for the purpose of collecting an overpayment.

73.     From mid-2015 until July 2016, the Hartford almost exclusively focused on Ms. King's SSD status, as evidenced by its communications with Allsup—the company with whom The Hartford contracted to represent Ms. King in her SSD matter.

74.     The Hartford recouped all of Ms. King's SSD benefits under a Repayment Clause in the Plan, which amounted to over $65,000.

75.     Of significance, however, The Hartford never inquired about the rationale for the SSA's approval of the benefits, or any of the evidence the SSA relied upon in reaching its determination.

76.     Once The Hartford secured Ms. King's SSDI overpayment, it focused its attention on limiting its financial liability on Ms. King's claim.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-8-

77.     In November 2016, Ms. King's internist, Dr. Kennett, continued to assign her less-than-sedentary functional restrictions.

78.     In January 2017, The Hartford's Senior Ability Specialist concluded that "based on the totality of the medical information further improvement in [Ms. King's] condition is not anticipated."

79.     On January 25, 2017, The Hartford reiterated that, "[b]ased on [Ms. King's] age, occupation and disabling condition [she] is a good [lump sum settlement] candidate as significant improvement in [her condition is] not anticipated, [other income benefits ("OIB")] resolved, 2017 [Social Security disability] reconciled."

80.     In stark contrast to its previous assessments, however, on February 6, 2017, a Hartford representative opined that, "given that [Ms. King] has shown some improvement in functionality since [the independent medical examination] 7/15 [sic][,] would not recommend [lump sum settlement] at this time. She may continue to improve."

81.     On February 7, 2017, another Hartford representative opined that, "[Ms. King] is still relatively young and has potential for further functional improvement, so file assigned to [continuing ability review] CAR 1 (CAR 4) for [follow-up] in 8 months. [Social Security disability] has been awarded and reconciled. Per PQ, [Ms. King] is not eligible for pension form any [employer]. It is noted that [employer] offers 401k only. Per CQ, [Ms. King] did not service in the military. [Lump sum settlement] is not appropriate due to potential for functional improvement. Claim is overpaid and balance is being recovered via partial benefit withholding."

82.     In arriving at this conclusion, The Hartford's representative clearly had financial recovery in mind, as the latter of his statements are all financial considerations (i.e. offsets and reasons why settlement would be too much of a financial liability).

83.     On September 27, 2017, The Hartford re-segmented Ms. King's LTD claim from "CAR 4" to "CAR 1."

84.     In its "CAR 1" review, which is also known as a "Financial Management" recommendation/plan, The Hartford noted that "financials reconcile on recalc[ulated] from

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-9-

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

LTD bed to present . . . [other income benefits] are resolved, [employee interview]; improved ability to work fulltime? [Ability analyst] will request [Attending Physician Statement] and [claimant questionnaire]. [Ability analyst] will review [Attending Physician Statement] for improved ability to work full time. Another [Employability Analysis Report] if [Ms. King] has near [full time] sed[entary] func[tion]."

85.     In December 2017, however, Dr. Kennett continued to assign to Ms. King less-than-sedentary capacity functional restrictions.

86.     Dr. Kennett noted Ms. King's physical restrictions and limitations are permanent, and that she is never expected to return to work secondary to her medical conditions.

87.     On July 23, 2018, however, a nurse case manager for The Hartford conducted a medical file review and determined that "[r]ecords appear to suggest POTS is no longer an issue. [Ms. King] is reporting wanting to pursue weight loss so she can be more active in daily life which would indicate potential for higher level function. Given the number of providers involved. MCM suggests considering a peer review with Occ[upational] Med[icine]."

88.     In August 2018, The Hartford, through an outside vendor, referred Ms. King's LTD claim to an occupational medical consultant, Sriram Mummaneni, M.D.

89.     Without ever examining or speaking with Ms. King or her medical providers, Dr. Mummaneni opined Ms. King is capable of performing full-time work, consisting of totally unrestricted standing or walking; lifting and carrying weights of up to 30 pounds for up to two hours in a day; frequently climbing stairs; frequently kneeling; and occasionally crouching and crawling, among other restrictions.

90.     While Dr. Mummaneni acknowledged Ms. King's "extensive conditions," he failed to assign appropriate limitations or reach appropriate conclusions.

91.     Ms. King, for example, has multiple medical diagnoses, including neurocardiogenic syncope, orthostatic hypotension, POTS, and non-epileptic seizures that make her a high fall risk.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

92.     Despite these diagnoses, which Dr. Mummaneni purports to acknowledge, he found no restrictions whatsoever with Ms. King's ability to stand or walk.

93.     Dr. Mummaneni also noted that Ms. King could frequently climb stairs and kneel, and occasionally stoop, crouch, and crawl.

94.     Positional changes, such as these, are known triggers for Ms. King's syncopal episodes and could result in serious injury.

95.     Notably, Dr. Mummaneni also failed to address Ms. King's non-exertional limitations resulting from fatigue and cognitive dysfunction.

96.     Despite the SSA's award, the opinions of Ms. King's physicians which supported her Disability, and the lack of documented improvement in Ms. King's medical conditions, The Hartford determined that Ms. King was no longer Disabled from a physical standpoint on September 11, 2018, on the basis of Dr. Mummaneni's report.

97.     In the September 2018 letter, The Hartford stated it would continue to pay Ms. King LTD benefits under a mental-nervous limitation in the Policy.

98.     Ms. King is Disabled as a result of *physical* impairments, as is clear from the medical record, and as Ms. King personally clarified with The Hartford on numerous occasions over the course of her LTD claim.

99.     At this point, Ms. King retained counsel to appeal The Hartford's adverse benefits determination.

100.    In November 2018, per The Hartford's request, Ms. King's representative notified The Hartford of Ms. King's current neurologist at the Mayo Clinic.

101.    In subsequent correspondence, The Hartford requested Ms. King, through her representative, send to her treatment provider a mental health form describing her mental health symptoms and limitations.

102.    The Hartford further asked Ms. King's representative to identify Ms. King's treating mental health providers.

103.    Ms. King's representative requested and received an extension from The Hartford to submit this additional information.

-11-

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

104. In a letter dated January 25, 2019, Ms. King's representative reported to The Hartford that Ms. King was not treating with a mental health specialist, and that "none of her treating physicians are suited to complete [the mental health form] . . ."

105. Ms. King's representative requested a form that would address Ms. King's physical conditions and Disability.

106. In a letter dated January 24, 2019, but not received by Ms. King's representative until January 31, 2019, The Hartford terminated Ms. King's LTD benefits outright (the "Denial").

107. The Hartford relied upon the opinion of a behavioral health case manager ("BHCM") who opined Ms. King was not Disabled from a mental health condition.

108. In the Denial, The Hartford disregarded the findings of the SSA, despite already collecting approximately $65,000 of Ms. King's SSD benefits.

109. The Hartford's entire rationale for rejecting the SSA's determination of Disability is as follows: "Though you are receiving Social Security Disability benefits (SSD), as we discussed with you and as explained in the SSD educational tool, it is possible to qualify for SSD but no longer continue to qualify for private disability benefits."

110. Oddly, subsequent to the Denial, in correspondence dated January 28, 2019, The Hartford provided the Attending Physician's Statement for physical Disabilities that Ms. King's representative requested prior to receiving the Denial.

111. Over the next several months, Ms. King's counsel repeatedly sent requests for relevant documents to The Hartford, because The Hartford would routinely omit relevant information from its disclosures, including the aforementioned surveillance videos taken by EMSI in 2014.

112. In a July 23, 2019 letter, Ms. King, through her legal representative, requested clarification of the deadline to appeal The Hartford's Denial.

113. Ms. King noted in that letter the language from prior correspondence from The Hartford stating she had 180 days, plus five days to account for mailing, to appeal the adverse benefit determination.

-12-

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

114.    ERISA regulations require a Plan Administrator to allow at least 180 days to appeal an adverse benefit determination following receipt of the determination by the claimant.

115.    Ms. King's representative noted that the 185-day deadline would fall on Monday, July 29, 2019.

116.    Ms. King's representative further noted she received The Hartford's January 24, 2019 Denial on January 31, 2019, and that the 180-day appeal period pursuant to ERISA regulations does not begin until the claimant *receives* the adverse benefit determination.

117.    The deadline to appeal the Denial was Monday, July 29, 2019.

118.    The Hartford explained in a March 6, 2019 letter:

As stated in our letters, you and/or your client have 180 days from the 1-24-19 adverse determination to appeal. The Hartford allows 5 additional days beyond this 180-day ERISA deadline for mail receipt. As noted in our 9-11-18 and 1-24-19 correspondences, if you disagree with the adverse determination communicated by Hartford you may appeal the decision. If you wish to do so, please follow the instructions outlined in those two letters.

119.    Based on The Hartford's stated timeframe, the deadline to appeal was July 29, 2019.

120.    On July 29, 2019, Ms. King appealed The Hartford's Denial (the "Appeal") and noticed The Hartford she would submit additional information within 30 days.

121.    On August 28, 2019, Ms. King supplemented her Appeal with additional evidence, including new medical records, medical literature regarding her impairments and medications, and the report of an independent vocational consultant which was supportive of a finding of Disability under the Plan.

122.    Ms. King asserted she remained Disabled under the Plan due to limitations resulting from physical impairments, not mental or nervous impairments as The Hartford previously concluded.

123.    In his report dated May 13, 2019, the vocational consultant debunked prior employability analyses performed by The Hartford's vocational consultants, who identified

-13-

several jobs Ms. King could perform based on the limitations and restrictions assigned by Dr. Mummaneni.

124. In a letter dated August 26, 2019, but not received by Ms. King until September 3, 2019, the Hartford asserted Ms. King's Appeal was untimely.

125. The Hartford refused to consider Ms. King's Appeal.

126. Considering the aforementioned timeframes, however, Ms. King timely appealed The Hartford's January 29, 2019 Denial.

127. The Hartford's refusal to consider the Appeal is evidence of its failure to conduct a meaningful dialogue with Ms. King and failure to provide Ms. King with the full and fair review to which she is entitled under ERISA.

128. The Hartford's refusal to consider Ms. King's Appeal is further evidence of a breach of fiduciary duty.

129. At all times throughout Ms. King's claim, The Hartford repeatedly acted in its own best financial interests—in this circumstance, by outright refusing to consider Ms. King's timely Appeal.

130. Upon information and belief, The Hartford is motivated to deny otherwise meritorious claims to benefit its own financial interests.

131. This is borne out by the structural conflict that exists by virtue of The Hartford's role as insurer of LTD benefits and decider of eligibility for LTD benefits.

132. Ms. King cannot perform the material duties of her occupation or Any Occupation and therefore comes within the definition of Disability under the Plan.

133. Ms. King exhausted her administrative remedies and timely filed this lawsuit.

**COUNT I**
**(Recovery of LTD Plan Benefits)**
**(Defendants The Hartford and the Plan)**

134. All other paragraphs are incorporated by reference.

135. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

136. The Plan represents LTD coverage and a promise to provide LTD benefits until Ms. King is no longer Disabled under the terms of the Plan.

137. Ms. King continues to be Disabled under the Your Occupation or Any Occupation definitions of Disability in the Plan.

138. Ms. King has claimed the benefits under the Plan to which she is entitled.

139. Ms. King reasonably expected that her medical conditions met the requirements of Disability as defined by the Plan and that she would receive benefits under the Plan until she reaches her Social Security Normal Retirement Age or until she was no longer disabled.

140. Despite the coverage of Ms. King's Disability, The Hartford and the Plan improperly terminated her LTD benefits in breach of the Plan and ERISA.

141. The Hartford and the Plan's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

142. Although the Policy states The Hartford has discretion with respect to claims and appeals and to interpret the Plan, under ERISA, that can only be true if the Plan reserved that discretion to the Plan Administrator, the Plan terms provide a mechanism for the Plan Administrator to delegate that discretion, and there is evidence that the discretion was delegated in accordance with the terms of the Plan.

143. On information and belief, the Plan does not properly delegate discretion to The Hartford.

144. Even if Airgas properly delegated discretionary authority to The Hartford, in light of The Hartford's wholesale and flagrant procedural violations of ERISA, Ms. King should be entitled to *de novo* review. *See Halo v. Yale Health Plan,* 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the

claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

145.    Instead of evaluating a participant's eligibility based on the applicable Plan language and medical evidence, Ms. King is informed and believes that The Hartford makes claims decisions based on the claims resources and financial risk it faces on certain claims.

146.    The Hartford wrongfully denied Ms. King's Disability benefits without providing a coherent explanation for its denials.

147.    The Hartford did not properly consider all of the available evidence when terminating Ms. King's benefits.

148.    The Hartford failed to conduct a full and fair review.

149.    As evidenced by The Hartford's nurse case manager's July 2018 internal note, The Hartford's failure to contact Ms. King's treating providers because there were too many involved is biased, arbitrary, and not indicative of a full and fair review.

150.    The Hartford misstated medical evidence for its own financial benefit, *e.g.,* it excessively relied on biased medical reviews provided by in-house medical consultants or paid medical consultants.

151.    On information and belief, when a claimant's file is supported by the medical evidence and treating provider assessments, The Hartford will solicit a medical file review or IME in an attempt to manufacture adverse evidence.

152.    For instance, The Hartford relied on the opinion of occupational medicine consultant, Sriram Mummaneni, M.D., who despite acknowledging Ms. King's myriad health problems, concluded Ms. King could stand and walk without restriction over the course of an eight-hour workday; frequently climb stairs; and lift, carry, push, or pull weights of up to 30 pounds.

153.    Dr. Mummaneni is a paid consultant of the Medical Consultants Network, with whom The Hartford contracts for non-examining physician consultant reviews, such as the one Dr. Mummaneni performed, and IMEs.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

154.    The Hartford relied on findings that constitute "clearly erroneous findings of fact" to deny Ms. King's benefits.

155.    The Hartford abused its discretion by basing its decision on unreliable and inaccurate opinions, such as Dr. Mummaneni's, and when confronted with the apparent flaws in his opinion, The Hartford ignored the inaccuracies or created new reasons for denying benefits.

156.    Upon information and belief, The Hartford used a paid, non-examining consultant to evaluate Ms. King's claim because The Hartford knew that the consultant's recommendations would be unfavorable for the continuation of Ms. King's benefits.

157.    The consultant, Dr. Mummaneni, arbitrarily reached his opinion based on insufficient evidence or investigation.

158.    Neither Dr. Mummaneni, nor any of The Hartford's nurse case managers or other internal medical reviewers, ever set forth any substantive reasons why Ms. King's treating doctors' opinions are incorrect.

159.    The Hartford failed to explain why it credited Dr. Mummaneni over Ms. King's treating physician and the findings of the SSA.

160.    Upon information and belief, The Hartford tainted its medical file reviewers by giving the reviewers inaccurate information regarding Ms. King, while also failing to provide its reviewers with all of the relevant evidence.

161.    Upon information and belief, The Hartford provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

162.    The Hartford routinely emphasizes information that favors a denial of benefits while deemphasizing other information that suggests a contrary conclusion.

163.    On information and belief, The Hartford routinely denies otherwise compensable claims to avoid setting aside additional reserves. To accomplish this goal, it "investigates" claims for the purpose of creating biased evidence to justify a denial. It does

-17-

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

this, in part, by determining segmentation or classification to pre-determine its financial exposure.

164.    The Hartford's financial documents, including Securities and Exchange Commission 10k filings, provide compelling evidence that The Hartford transformed its profitability by dedicating resources to claims management for the purpose of claims termination.

165.    The practice of segmentation helped The Hartford accomplish this.

166.    On information and belief, The Hartford decides in advance how long claims should be paid, often to the test change or change in definition of Disability under a Policy, and then takes claims management measures to ensure those goals are met.

167.    One year after the implementation of segmentation practices, by 2013, the loss ratio for The Hartford's group disability claims had improved from 92% to 84%.

168.    The Hartford's 84% loss ratio at the end of 2013 represented an overall improvement of approximately 22% from the end of 2011.

169.    To explain this remarkable turnaround, The Hartford stated: "[t]he improvement in the loss ratio in 2013 was primarily attributable to the long-term disability product driven by favorable claim recoveries from claims incurred in 2013 and prior years, lower incidence trends and improved renewal pricing. Additionally, the 2012 loss ratio reflected unfavorable long-term disability severity . . ."

170.    The Hartford and Airgas also unreasonably withheld relevant documents throughout the entire claim and poorly managed the file, which is evidenced, in part, by its repeated failure to provide all relevant documents and information, despite numerous requests.

171.    Ms. King, through counsel, requested full disclosures of relevant documents on five separate occasions from October 2018 through July 2019.

172.    The Hartford and Airgas's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrate its abuse of discretion and improper claims handling.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

173.    The Hartford failed to properly consider the opinions of Ms. King's treating and examining physicians, such as Dr. Kennett.

174.    In terminating Ms. King's LTD benefits, the Hartford completely disregarded evidence that Ms. King's conditions had not changed or improved.

175.    In an April 2015 Attending Physician Statement, for instance, Dr. Kennett opined Ms. King could only sit for two hours at a time, for a total of four hours combined, in an eight-hour workday.

176.    The limitations Dr. Kennett assigned would preclude Ms. King from performing even sedentary work.

177.    Under Social Security and Department of Labor criteria, sedentary work requires the ability to sit for at least six of eight working hours.

178.    In July 2016, the SSA determined Ms. King was totally disabled under a more rigorous standard of Disability than that set forth in the Plan.

179.    In late 2017, Dr. Kennett again assigned to Ms. King physical limitations and restrictions inconsistent with even sedentary work.

180.    Despite all of this, The Hartford still commenced a review in 2018 designed to result in the termination of Ms. King's LTD claim.

181.    The Hartford has no evidence that Ms. King's conditions changed or improved since it determined that she met the Any Occupation definition of Disability in the Policy.

182.    The Hartford disregarded the findings of the SSA that Ms. King is totally disabled.

183.    The Hartford engaged in other procedural irregularities, which it did to serve its own financial best interests.

184.    On information and belief, the Hartford engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

185. The Hartford knowingly did not collect all medical evidence, including Ms. King's recent visits with a neurologist, before terminating her claim.

186. The Hartford intentionally gathered evidence to stack the deck in its favor and against Ms. King.

187. Ms. King alleges upon information and belief that the Hartford has a parsimonious claims handling history.

188. On information and belief, The Hartford has targeted Ms. King's claim, because it is no longer receiving premiums from Airgas, her former employer.

189. The Hartford failed to conduct a "meaningful dialogue" regarding Ms. King's claim, most notably by failing to consider Ms. King's timely Appeal.

190. Under the de novo standard of review, to be entitled to benefits, Ms. King need only prove by a preponderance of the evidence that she is Disabled.

191. Even under the abuse of discretion standard of review, the Hartford abused its discretion, because its decision terminating Ms. King's disability benefits was arbitrary and capricious and caused or influenced by The Hartford's conflict of interest. This conflict of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

192. The Hartford, as a pattern and practice, improperly and proactively applies its mental-nervous policy limitation to claims in an effort to limit its financial liability and reserves. This is evidence of its structural conflict of interest improperly influencing its claims determinations.

193. The Hartford limits its reserves in ERISA cases by improperly segmenting claims as part of an institutional bad faith pattern and practice.

194. The Hartford knows ERISA does not provide for punitive damages and further provides limited discovery, so its misconduct is further concealed in ERISA cases.

195. Ms. King is entitled to discovery regarding the effects of the procedural irregularities and the structural conflict of interest that infiltrated the claims handling process and also regarding the effects of The Hartford's reviewing physicians', its

**OBER PEKAS RONSTADT, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

employees', and its vendors' financial conflicts of interest, biases, and motivations on the decision terminating Ms. King's LTD claim.

196.    Under the de novo standard of review, Ms. King is entitled to discovery regarding, among other things, the credibility of The Hartford's medical reviews and The Hartford's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the de novo standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

197.    Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Ms. King is entitled to recover all benefits due under the terms of the Plan, and to enforce her rights under the Plan.

198.    Ms. King is entitled to reinstatement of any other benefits that were terminated, discontinued, or suspended as a result of the termination of her Disability benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

199.    Pursuant to 29 U.S.C. § 1132(g), Ms. King is entitled to recover her attorneys' fees and costs incurred herein.

200.    Ms. King is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid.

**COUNT II**
**(Breach of Fiduciary Duty)**
**(The Hartford)**

201.    All other paragraphs are incorporated by reference.

202.    Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

203.    To the extent that The Hartford's denial of benefits caused Ms. King harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

204.    The Hartford is a fiduciary and owes fiduciary duties to Plan participants, including Ms. King.

205.    Under 29 U.S.C. § 1104(a), The Hartford is required to discharge their duties with the care, skill, prudence, and diligence under the circumstances that a prudent man or woman acting in like capacity and familiar with such matters would use.

206.    Under ERISA, which is founded in trust principles, The Hartford is required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

207.    The Hartford's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because The Hartford's claims handling was discharged imprudently and caused Ms. King serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

208.    The Hartford's failure to act prudently and in the best interests of Ms. King is a breach of fiduciary duty requiring appropriate equitable relief following discovery of The Hartford's conduct as it relates to Ms. King's claim.

209.    In multiple other ways throughout the administration of Ms. King's claim, The Hartford breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

210.    The Hartford, as a pattern and practice, improperly and proactively applies its mental-nervous policy limitation to claims in an effort to limit its financial liability and reserves.

211.    The Hartford deliberately mischaracterized the nature of Ms. King's Disability as mental, and then erroneously terminated Ms. King's LTD benefits on specious evidence.

212.    The Hartford refused to consider the Appeal, so that it could avoid reviewing the claim on the merits.

213.   The Hartford refused to consider the claim, knowing it was ERISA, and knowing it would be insulated from any real penalty for its conduct due to the limited remedies available under ERISA.

214.   On information and belief, The Hartford's classification of physical disability claims using a mental-nervous limitation in its policies is driven by its institutional objective of increasing corporate profitability, not fair claims handling.

215.   On information and belief, The Hartford instructs and/or incentivizes certain employee(s) to terminate fully insured LTD claims and appeals based on bias or its financial interests.

216.   Ms. King is informed and believes that The Hartford has targeted claims under the Plan, including Ms. King's, which is a breach of fiduciary duty.

217.   Ms. King is informed and believes that The Hartford's employees are trained in administering claims in the best interests of The Hartford, not Plan participants.

218.   This is evident from The Hartford's successful attempts to collect over $65,000 from Ms. King's Social Security disability benefits award, and then its summary rejection of the SSA's finding regarding Ms. King's disabled status.

219.   The Hartford also demonstrated bias and malice against Ms. King through its employees. Instead of fully and fairly reviewing the medical evidence, The Hartford unreasonably denied Ms. King's claim based on unreliable or incomplete evidence.

220.   Of note, The Hartford terminated Ms. King's claim before obtaining new medical treatment records from a neurologist, which The Hartford was aware of, and which bear directly on the nature of Ms. King's Disability.

221.   The Hartford also relied upon the opinion of Dr. Mummaneni, who never spoke to the claimant's treating physicians regarding her impairments or functional restrictions.

222.   The Court has broad discretion to fashion appropriate relief to make Ms. King whole and should mold the relief necessary to protect the rights of the Plan participants.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

223.    Ms. King is entitled to injunctive or mandamus relief under 29 U.S.C. §
1132(a)(3).

224.    She is entitled to enjoin any act or practice by The Hartford that violates
ERISA or the Plan, or seek other appropriate equitable relief that is traditionally available in
equity.

225.    The Hartford should be enjoined from limiting Ms. King's Disability benefits
under the aforementioned mental-nervous limitation in the Policy, absent the express
conclusion of her treating physician on a future date that her Disability is caused by a
Mental Illness.

226.    Legal remedies are inadequate to prevent The Hartford from arbitrarily
reclassifying Ms. King's Disability under the aforementioned mental-nervous limitation,
thereby limiting its future liability on otherwise payable claims. Hence, equitable relief is
appropriate.

227.    Ms. King would suffer irreparable harm should The Hartford attempt to limit
its liability using the mental-nervous limitation in the Policy. The Policy allows for
continued benefits, assuming Ms. King's ongoing eligibility, until age 65, or for another 13
years. The Hartford's improper categorization of Ms. King's Disability as mental-nervous in
nature would allow it to deprive Ms. King of Disability benefits to which she might
otherwise be eligible.

228.    The balance of hardships between the parties weighs in Ms. King's favor. The
Hartford would still be allowed to pursue its investigation of Ms. King's ongoing eligibility
for LTD benefits but would be precluded from wrongfully terminating Ms. King's LTD
benefits again for mental nervous conditions, absent the written opinion of her treating
physician.

229.    An injunction against The Hartford would further serve the public interest by
setting a precedent to protect the rights of Hartford claimants to receive LTD benefits to
which they remain entitled, and by fulfilling the purposes of ERISA to protect the interests
of plan participants.

-24-

230.    The Hartford should further be enjoined from relying upon non-examining peer reviewers' opinions, such as the opinion of Dr. Mummaneni, when those consultants do not first consult Ms. King's treatment providers before issuing their reports.

231.    Legal remedies are inadequate to prevent The Hartford from similarly utilizing biased medical consultants in the future to generate unfavorable evidence to justify claims denials.

232.    Ms. King would again be irreparably harmed by a future benefits denial based on unreliable or incomplete evidence. The resulting loss of her financial security would have a devastating and far-reaching impact, as it did in this case, that an (a)(1)(b) remedy would be inadequate to remediate.

233.    The balance of hardships between the parties justifies this limited injunctive relief, because it would allow The Hartford to continue utilizing peer review consultants in future claims handling, but only to the extent those physicians first consulted with Ms. King's treating physicians, which would allow for a full and fair review, and the meaningful dialogue ERISA requires.

234.    The public interest would again weigh in favor of such relief, as it would set a precedent to protect ERISA claimants that is congruent with the purpose of ERISA.

235.    Based on the facts of this case, Ms. King has "other equitable relief" available to her in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Ms. King whole for her losses from the Hartford's breaching conduct.

236.    The Hartford's termination of Ms. King's LTD benefits has been financially devastating to her.

237.    Ms. King has had to borrow money from her daughter and her elderly mother.

---

[1] A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-25-

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

238.   Due to the loss of income, Ms. King's friends help her with groceries and completing miscellaneous tasks.

239.   Ms. King can no longer afford her mortgage.

240.   She has fallen behind on credit card payments and accrued $5,500 in additional debt.

241.   Ms. King is now getting divorced due to financial hardship caused by The Hartford.

242.   The Hartford was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Ms. King's benefits for its own profit.

243.   ERISA "does not elsewhere adequately remedy" the injuries caused to Ms. King by the Hartford breach of fiduciary duty violations.

244.   As a direct and proximate result of the breaches of fiduciary duty, Ms. King suffered actual, *significant* financial harm and has incurred financial expense.

245.   Ms. King is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid in full.

246.   Pursuant to 29 U.S.C. § 1132(g), Ms. King is entitled to recover her attorneys' fees and costs incurred herein.

**WHEREFORE**, on all claims, Ms. King prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A.   All past LTD benefits under the terms of the Plan;

B.   Clarifying and determining Ms. King's rights to future benefits under the terms of the Plan;

C.   For any other benefits Ms. King may be entitled to receive under the Plan due to her disability;

D.   All other equitable relief that is proper, including injunctive and surcharge relief, as a result of The Hartford's breaches of fiduciary duties;

E.   An award of Ms. King's attorneys' fees and costs incurred herein;

-26-

F.      An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G.      For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 25th day of March, 2020.

OBER PEKAS RONSTADT, PLLC


By: *s/ Erin Rose Ronstadt*
        Erin Rose Ronstadt
        Clayton W. Richards
        Attorneys for Plaintiff

**OBER PEKAS RONSTADT, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

-27-